Filed 9/30/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>DUWAN D. FIELDS et al.,<br><br>  Defendants and Appellants. | A135605<br><br>(Contra Costa County<br>Super. Ct. No. 05-111775-3) |

A jury convicted defendants Duwan D. Fields and Claudiens Santrail Griffin of eight counts of pimping, pandering, and committing sexual offenses against minors. Defendants contend their convictions must be reversed due to asserted instructional errors. Griffin further contends his conviction for oral copulation with a minor is not supported by substantial evidence and his felony sentence for the offense violates his right to equal protection of the law. Both defendants challenge a restitution award made jointly and severally against them. We reverse the order of restitution against defendant Fields, and otherwise affirm the judgments against both defendants.

## I. BACKGROUND

Fields was charged by amended information with pimping Jane Doe 2 (count one) and Jane Doe 3 (count two), minors over the age of 16 (Pen. Code,[1] § 266h, subd. (b)); and engaging in an act of unlawful sexual intercourse with Jane Doe 3, a minor more than three years younger than Fields (§ 261.5, subd. (c); count three).

_____

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A.1., II.B., II.C., II.D., II.E., and II.F.

[1] All statutory references are to the Penal Code.

Griffin was charged with committing lewd acts upon Jane Doe 1, a child under the age of 14 (§ 288, subd. (a); counts four & five); pimping Jane Doe 3, a minor over the age of 16 (§ 266h, subd. (b); count six); pandering Jane Doe 3 (§ 266i, subd. (a); count seven); forcibly raping Jane Doe 3 (§ 261, subd. (a)(2); count eight); and participating in an act of oral copulation with Jane Doe 3, a minor under the age of 18 (§ 288a, subd. (b)(1); count nine). Griffin entered an open plea of no contest to count four, which was amended to identify the lewd act as oral copulation.

A jury was sworn and impaneled on March 7, 2012. After 11 days of testimony, the jury found both defendants guilty of all of the charges against them.

**A. *Trial Evidence***

On April 20, 2009, three female foster children—13-year-old Jane Doe 1, 17-year-old Jane Doe 2, and 16-year-old Jane Doe 3— ran away from a group home for children in protective custody operated by Child Protective Services in Sacramento. They got a ride from a stranger to an area of Sacramento known as Del Paso Heights and walked to an apartment Jane Doe 1 knew about in the area. At the apartment, they met some males, including Griffin. Later, the girls met Fields and Fields's girlfriend, S.G., who was Griffin's 16-year-old sister.

In a car driven by Fields, Griffin, Jane Doe 3, and S.G. left Del Paso Heights after a few days and went to Fields's condominium in San Ramon. Jane Doe 1 and Jane Doe 2 also went to San Ramon. Just before leaving for San Ramon, Jane Doe 3 overheard a telephone call made by Griffin in which he told someone "he had girls ready to make money and they could go to San Francisco."

Soon after they arrived in San Ramon, Fields and S.G. told Jane Doe 2 "they wanted me to get ready to . . . go do this stuff." S.G. gave Jane Doe 2 clothes to wear, and helped her get ready to go. Fields, S.G., Jane Doe 2 and Jane Doe 3 went to a house in San Francisco, and then left to go to a hotel. On the way to the hotel, Jane Doe 2 realized that she, Jane Doe 3, and S.G. "were actually going to be having sex with other people." When they arrived at the hotel, S.G. and Fields told Jane Doe 2 "to show [Jane Doe 3] how to moan and groan." Also, she should "[j]ust do whatever the guy asked"

2

and to "act like you're enjoying it and whatnot." They warned, however, "to make sure you get the money from the guy."

As instructed, Jane Doe 3 went up to the hotel room first to perform oral sex on the client as a means of ensuring he was not a police officer; then, "if everything was okay and he allowed [her] to go down and stuff . . . then . . . [Jane Doe 3] would tell him to go get [Jane Doe 2]." Later, when both Jane Doe 2 and Jane Doe 3 were in the room with the client, they both engaged in sexual intercourse with him.

From that night until April 28, 2009, Jane Doe 2 went out with Fields and S.G. to meet with clients every night but one. Jane Doe 2 could not go that one night because she was "hurting too much" because of an appointment in which she and Jane Doe 3 had met with "a room full of guys." Jane Doe 2 had had sexual intercourse with four men at that appointment; in addition, the men had digitally penetrated both Jane Doe 2 and Jane Doe 3. After that appointment, "[a] lot of money was collected and it was [Fields] and [S.G.]" who ultimately got the money.

Jane Doe 2 testified neither Fields nor S.G. ever gave her money for what she "had to do." S.G. told Jane Doe 2 that the money she had earned was used to pay for clothing. The girls stayed in Fields's home and were also provided food. S.G. generally answered telephone calls from clients responding to ads Fields had placed on Craigslist; Jane Doe 2 did so on one occasion as well. When answering these calls, there was a "script" they were supposed to follow, and a pricing structure for the various sexual acts the girls could perform on the clients. Fields and S.G. drove the girls to and from each appointment, and collected the money earned. Jane Doe 2 and Jane Doe 3 would use condoms provided by Fields and S.G.

Jane Doe 1 did not go out to any appointments with clients. Griffin told Jane Doe 1 that when she turned 14, she would "be put on the track,"[2] and would "wind up being a hoe like the others." Griffin talked about being a pimp; specifically, he said, "he just be

---

[2] Sacramento County Sheriff's Detective Michelle Hendricks defined "the track" as "basically, walking the stroll, and you had sex for money with strange men."

3

glad when he got the money." Griffin told Jane Doe 1 "[t]hat if any of us told, that they'd find us." While in San Ramon, Jane Doe 1 engaged in sexual intercourse with Griffin, and she orally copulated him.

Jane Doe 3 testified she went on several appointments with Jane Doe 2 and S.G. During that time, she also engaged in sexual intercourse with Griffin several times. On one of these occasions, she told Griffin "no" but he held her tightly with his hands and continued to engage in sexual intercourse even after she tried "to push him off." Jane Doe 3 told Detective Hendricks Griffin "raped" her on that occasion. On another occasion, Jane Doe 3 engaged in sexual intercourse with Fields after S.G. called Jane Doe 3 into the bedroom she shared with Fields and asked Jane Doe 3 if she wanted "to have sex with her man."

On April 28, 2009, about 1:34 a.m., Foster City Police Officer Stephen Sealy stopped a car driven by Fields; S.G. was in the front passenger seat, and Jane Doe 2 and Jane Doe 3 were seated in the back seat of the car. Upon the officer's initial contact with the females in the car, they provided him with false names and dates of birth.[3] Officer Sealy testified Jane Doe 2 and Jane Doe 3 were scantily dressed in "pretty tight clothes."

After defendants were arrested, police searched the San Ramon residence and found, among other items, a tray of condoms in the bedroom shared by Jane Doe 1, Jane Doe 2, and Jane Doe 3, a piece of paper with "call back numbers," and a listing of "John type services." Fields's cell phone number was included in a Craigslist erotic services ad discovered in this case.

Criminalist Da-Shing Peng testified the sperm found on underwear collected from Jane Doe 1 was Griffin's to a very high level of statistical certainty. During an interview with police, Griffin admitted Jane Doe 1 and Jane Doe 3 had orally copulated him.

Holly Joshi, a police sergeant with the Oakland Police Department, testified as an expert on the subjects of child exploitation and pimping. Sergeant Joshi described the different models of pimping and pandering operations, explaining there is always a pimp

---

[3] The girls had been instructed to use false names and ages by Fields and S.G.

4

at the top and there may also be a "pimp in training." The "bottom girl" is one who has authority over the other prostitutes in the operation, and has generally been around the pimp the longest amount of time. Based on her review of the materials in this case, she opined that Fields was the pimp and Griffin was a "pimp in training," or "baby pimp." She explained a pimp generally does not allow another male in the home with "his stable of girls" unless he is a pimp-in-training. She believed S.G. was the "bottom girl," and Fields, as the pimp-in-charge, exerted psychological control on S.G. and the other prostitutes.

**B. *Judgment and Appeal***

The trial court sentenced Griffin to state prison for a total term of three years eight months, and sentenced Fields to state prison for a total term of eight years. Notices of appeal were timely filed in May 2012.

## II. DISCUSSION

**A. *Griffin's Oral Copulation Conviction (Count Nine)***

Griffin contends the prosecution wholly failed to establish the corpus delicti of the crime of oral copulation with Jane Doe 3. In the alternative, if this court finds the evidence was sufficient to support his conviction, Griffin maintains his felony sentence for that offense violated his right to equal protection because a person of his age convicted of unlawfully engaging in sexual intercourse with the same victim could only have been punished as a misdemeanant.

**1. *Corpus Delicti***

Jane Doe 3 testified at trial that she and Griffin had sexual intercourse twice at the San Ramon apartment. Sacramento County Sheriff's Detective Michelle Hendricks testified at trial that she interviewed Jane Doe 3 twice in early May 2009. Jane Doe 3 told the officer she and Griffin had intercourse three or four times, and characterized the sex as only vaginal intercourse. Griffin, however, admitted he engaged in an act of oral

copulation with Jane Doe 3 when he was interrogated by police.[4] She was 16 years old at the time and Griffin was 18 years old.

Griffin contends his admission to police was insufficient to support the verdict because the prosecutor failed to establish the corpus delicti. " 'In any criminal prosecution, the corpus delicti must be established by the prosecution independently from the extrajudicial statements, confessions or admissions of the defendant.' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1057.) The purpose of the corpus delicti rule is to assure the defendant is not admitting to a crime that never occurred. (*People v. Jennings* (1991) 53 Cal.3d 334, 368.)

The "corpus" of a crime is not synonymous with the "elements" of the crime. (*People v. Hawkins* (2004) 124 Cal.App.4th 675, 680.) The prosecution, for example, need not prove the identity of the perpetrator by independent evidence, nor is independent evidence required to demonstrate the degree of a homicide. (*Ibid.*) "There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.] In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1171.)

*People v. Jones* (1998) 17 Cal.4th 279 (*Jones*) is illustrative. The victim in that case had been shot in the head and left to die by a roadside. Her underclothing had been removed, and residual semen was found on her clothing, genitals and anus. (*Id.* at pp. 302, 291.) Although there was no physical evidence the victim had engaged in oral sexual acts, the defendant was convicted of aiding and abetting forced oral copulation because he had admitted the crime to police. On appeal, the defendant argued for a reversal of this conviction under the doctrine of corpus delicti. In affirming the trial

---

[4] Griffin's trial counsel acknowledged Griffin's admission to the offense in his closing argument to the jury and stated, "And I will have no problem with you finding my client guilty of that."

court's decision to overturn a magistrate's dismissal of the charge, the court held: "Section 288a, subdivision (a), defines this crime as 'the act of copulating the mouth of one person with the sexual organ or anus of another person.' [¶] Keeping in mind the low threshold of proof required to satisfy the corpus delicti rule, we conclude that the magistrate erred in finding this low threshold was not met by the evidence presented at the preliminary examination. The state of the victim's clothing (no underwear or shoes) and the forensic evidence . . . indicates multiple sexual acts occurred. [The evidence of force and violence] gives rise to an inference that the sexual activity that occurred was against the victim's will. This circumstantial evidence of multiple forcible sexual acts sufficiently establishes the requisite prima facie showing of both (i) an injury, loss or harm, and (ii) the involvement of a criminal agency. [¶] . . . [¶] . . . [W]e have never interpreted the corpus delicti rule so strictly that independent evidence of every physical act constituting an element of an offense is necessary. Instead, there need only be independent evidence establishing a slight or prima facie showing of some injury, loss or harm, and that a criminal agency was involved." (*Jones*, at pp. 302–303.)

Here, section 288a, subdivision (b) generally proscribes oral copulation with a minor under 18 years of age. Section 261.5, subdivision (b) proscribes sexual intercourse with a minor who is not more than three years younger than the perpetrator. The evidence showed Jane Doe 3 was 16 years old at the time of the incident and Griffin was 18. Trial testimony established Griffin had sexual intercourse with Jane Doe 3 several times and on one occasion the intercourse was forcible. This evidence of multiple unlawful sexual acts "establishes the requisite prima facie showing of both (i) an injury, loss or harm, and (ii) the involvement of a criminal agency" to satisfy the corpus delicti rule. (*Jones*, *supra*, 17 Cal.4th at p. 302.) The prosecution was not required to provide independent evidence of the physical act of oral copulation with Jane Doe 3 in order to use Griffin's admission to that offense to meet its burden of proof. (*Id.* at p. 303.) The evidence was sufficient in this case to support Griffin's conviction for that offense.

## 2. *Equal Protection*

A violation of section 288a, subdivision (b)(1) is punishable either as a felony or a misdemeanor. In this case, the trial court treated Griffin's offense as a felony, sentencing him to eight months in prison (one-third the midterm) for the offense, to be served consecutively to the three-year sentence it imposed on one of the other counts. Had Griffin been found guilty of unlawfully engaging in sexual intercourse with Jane Doe 3, the crime could only have been punishable as a misdemeanor under section 261.5, subdivision (b). According to Griffin, this discrepancy in punishment violates his right to equal protection of the law under the reasoning of *People v. Hofsheier* (2006) 37 Cal.4th 1185 (*Hofsheier*).

The People argue Griffin failed to raise his equal protection claim in the trial court, and has therefore forfeited it on appeal. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 362 [holding that a defendant could not raise an equal protection challenge for the first time on appeal].) The People have nonetheless fully briefed the issue, and we will therefore exercise our discretion to address the merits of the issue.

*Hofsheier* involved an adult offender convicted under section 288a, subdivision (b)(1) of a voluntary sexual act with a minor 16 years or older.[5] (*Hofsheier, supra*, 37 Cal.4th at p. 1198.) All such offenders were required by state law to register for life as sex offenders under section 290. (*Hofsheier*, at p. 1198.) In contrast, an adult offender convicted of sexual intercourse with a minor 16 years or older under section 261.5 was not then subject to mandatory registration.[6] (*Hofsheier*, at p. 1197.)

---

[5] We use the term "voluntary" in the special and restricted sense in which it is used in the *Hofsheier* opinion to indicate the minor victim willingly participated in the act and none of the statutory aggravating circumstances—such as the defendant's use of force or the victim's unconsciousness or intoxication—apply. (See *Hofsheier, supra*, 37 Cal.4th at p. 1193, fn. 2.) We recognize, however, a minor is not capable of legally consenting to a sexual act and do not intend to intimate otherwise.

[6] Former section 290, subdivision (a)(2)(E) provided that a person convicted of certain other sexual offenses not included specifically in section 290, including section 261.5, subdivision (b), *may* be required to register " 'if the court finds . . . that the person committed the offense as [a] result of sexual compulsion or for purposes of sexual

8

The defendant in *Hofsheier* asserted the distinction in treatment under section 290 violated his right to equal protection. (*Hofsheier*, at p. 1198.) The Supreme Court first addressed the threshold question of whether the law being challenged—the sex offender registration statute—adopted a classification affecting two or more *similarly situated* groups in an unequal manner. (*Id.* at p. 1199.) The court noted both of the criminal statutes involved concerned sexual conduct with minors. (*Id.* at p. 1200.) Since the only difference between the two offenses was the nature of the sexual act, the court found persons convicted under the two statutes were " 'sufficiently similar to merit application of some level of scrutiny to determine whether distinctions between the two groups justify the unequal treatment.' " (*Ibid.*, quoting *People v. Nguyen* (1997) 54 Cal.App.4th 705, 715.) Because the case involved no classification subject to heightened scrutiny under established equal protection jurisprudence, the court held the rational relationship test applied. (*Hofsheier,* at pp. 1200–1201.) In other words, in view of the objectives of the sex offender registration law, was there any reasonably conceivable state of facts that could provide a rational basis for making persons convicted of voluntary oral copulation with a minor over age 16 *automatically* subject to lifetime registration while treating persons convicted of voluntary sexual intercourse with a minor of the same age under section 290's *discretionary* provisions? (*Hofsheier*, at pp. 1200–1201.)

*Hofsheier* answered this question in the negative. The Attorney General in *Hofsheier* took the position it was " 'reasonably conceivable' that adults who engage in voluntary oral copulation with minors 16 or 17 years of age are more likely to repeat their offense than adults who engage in voluntary sexual intercourse with minors of the same age." (*Hofsheier*, *supra*, 37 Cal.4th at p. 1203.) This in turn was based solely on media reports that due to the risk of pregnancy and HIV from engaging in sexual intercourse, oral copulation had become more prevalent among adolescents in preceding years.

gratification' " and "state[d] the reasons for requiring lifetime registration as a sex offender." (*Hofsheier, supra,* 37 Cal.4th at p. 1197.) Former section 290 thus gave "the trial court discretion to weigh the reasons for and against registration in each particular case." (*Hofsheier*, at p. 1197.)

9

(*Ibid.*)  The court found the Attorney General's thesis about relative reoffense rates to be wholly lacking in empirical support.  (*Id.* at p. 1203.)  The court was unable to find any plausible basis for the distinction in treatment under the sex offender registration law based on any reasonably conceivable facts, and indeed found mandatory lifetime registration of all persons convicted under section 288a, subdivision (b)(1) to be "a historical atavism dating back to a law repealed over 30 years ago that treated all oral copulation as criminal regardless of age or consent." (*Hofsheier*, at p. 1206.)  The court concluded the Legislature could require lifetime registration *both* for persons convicted of voluntary oral copulation *and* for those convicted of voluntary sexual intercourse, but it could not treat them differently under that law.  (*Id.* at p. 1207.)

*Hofsheier* did not address, however, the issue Griffin raises—whether there is a rational reason based on the purposes of the criminal sentencing laws that the Legislature might have wanted to allow trial courts greater discretion over the criminal penalty for oral copulation between adults and 16- or 17-year-old minors than the penalty for sexual intercourse between the same persons.

Griffin also relies on *State v. Limon* (2005) 280 Kan. 275 [122 P.3d 22] (*Limon*). *Limon* invalidated a Kansas "Romeo and Juliet" statute providing more lenient treatment for voluntary sexual intercourse or sodomy with a 14- or 15-year-old minor relative to statutory rape and sodomy if the offender was less than four years older than the victim, and the victim and offender were members of the same sex.  (*Id.* at p. 276.)  In other words, the Kansas leniency statute made no distinction between voluntary sexual intercourse and voluntary oral copulation between young persons, but it excluded homosexual acts from its coverage.  Based on *Lawrence v. Texas* (2003) 539 U.S. 558 (*Lawrence*),[7] *Limon* held Kansas's statutory distinction between homosexual and

---

[7] *Lawrence* invalidated a Texas statute criminalizing " 'deviate sexual intercourse' " between persons of the same sex on due process grounds, finding no legitimate state purpose for the statute's intrusion into the personal and private life of the individual.  (*Lawrence, supra,* 539 U.S. at pp. 563, 578.)

10

heterosexual acts violated the equal protection clauses of the state and federal Constitutions. (*Limon*, at pp. 277, 301–302.) We do not have that issue in this case.[8]

Notwithstanding his reliance on *Hofsheier*, which applied a rational relationship test, Griffin asserts in passing that the sentencing disparity in issue here "arguably should . . . be subject to strict scrutiny" because it implicates his liberty interests. However, a defendant does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 838 [finding rational basis test applicable to disparate punishments for similar battery offenses against custodial officers].) Griffin ventures no argument to the contrary, but stands on the claim that "*Hofsheier* compels the conclusion that the classification at issue here cannot . . . withstand the more deferential rational relationship test . . . ." As we have explained, *Hofsheier* is not in fact controlling here.

The burden of demonstrating the invalidity of a classification under the rational relationship standard rests squarely on the party who challenges it. (*Chan v. Judicial Council of California* (2011) 199 Cal.App.4th 194, 204 (*Chan*).) Griffin's burden in this case is to demonstrate that the disparity in treatment of offenders convicted under sections 288a, subdivision (b)(1) and 261.5, subdivision (b) bears no rational relationship to any *conceivable* legitimate state purpose. (*Chan*, at p. 204.) This is a substantial burden. "There is no question that the determination of punishment for various offenses inherently involves value and policy determinations left to the Legislature, or to the people acting in a legislative capacity, and penal classifications will be upheld unless they are irrational." *(People v. McKee* (2010) 47 Cal.4th 1172, 1204.)

We note the Legislature has revisited the subject of voluntary sexual conduct involving minors multiple times since 1970, making nuanced choices about the criminal

---

[8] Although oral copulation with a minor under section 288a, subdivision (b)(1) encompasses acts between persons of the same sex whereas unlawful sexual intercourse requires penile-vaginal intercourse (*People v. Holt* (1997) 15 Cal.4th 619, 675–676), we need not consider the potential *Lawrence/Limon* challenge that could be raised to a felony sentence imposed for oral copulation between an adult and a same-sex minor less than three years younger.

11

punishments to be applied for such conduct.[9]  In 1975, the Legislature decriminalized sodomy between adults, which had been punishable as wobbler since 1950.  (Stats. 1950, 1st Ex. Sess., ch. 56, § 1, p. 512; Stats. 1975, ch. 71, § 10, p. 134.)  In that year, the Legislature also differentiated the punishments for oral copulation, making oral copulation with a minor punishable as a wobbler with a maximum sentence of five years, making the same act a felony if the adult was over 21 and the minor under 16 years of age, and making oral copulation with a minor under age 14 subject to a minimum three-year sentence if the adult offender was more than 10 years older.  (Stats. 1975, ch. 877, § 2, p. 1958.)  At that time, unlawful sexual intercourse with a minor female was punishable as a wobbler with a maximum felony sentence of three years.  (Former §§ 261.5, 264, subd. (a).)  In 1993, the Legislature made section 261.5 gender neutral. (Stats. 1993, ch. 596, § 1, p. 3139.)  The Legislature opted at the same time to

_____

[9]  The following statutes reflect just the amendments affecting criminal punishments for voluntary sexual conduct involving minors made since 1970:

(1)  amendments made to section 288a by Statutes 1975, chapter 71, section 10, page 134; Statutes 1975, chapter 877, section 2, page 1958; Statutes 1977, chapter 490, section 2, page 1614; Statutes 1978, chapter 579, section 18, page 1984; Statutes 1979, chapter 944, section 7, page 3254; Statutes 1981, chapter 896, section 2, page 3415; Statutes 1985, chapter 1085, section 5, page 3636; Statutes 1986, chapter 1299, section 5, page 4595; Statutes 2010, chapter 219, section 8, page 1108;

(2)  amendments made to section 261.5 by Statutes 1993, chapter 596, section 1, page 3139; Statutes 1998, chapter 925, section 1, page 6174;

(3)  amendments made to section 288 (lewd and lascivious conduct) by Statutes 1976, chapter 1139, section 177, page 5110; Statutes 1978, chapter 579, section 17, page 1984; Statutes 1981, chapter 1064, section 1, page 4093;

(4)  amendments made to section 286 (sodomy) by Statutes 1975, chapter 71, section 7, page 133; Statutes 1975, chapter 877, section 1, page 1957; Statutes 1976, chapter 1139, section 175, page 5110; Statutes 1977, chapter 490, section 1, page 1613; Statutes 1979, chapter 944, section 6, page 3253;

(5)  adoption in 2004 of section 675 (sentence enhancement for persons convicted of felony unlawful sexual acts with minors procured by payment) by Statutes 2004, chapter 769, section 1, page 5957;

(6)  adoption in 2006 of section 288.7 (sexual acts with a child under 10 years of age) by Statutes 2006, chapter 337, section 9, pages 2590–2591.

differentiate the punishments for unlawful sexual intercourse, including the misdemeanor classification now found in section 261.5, subdivision (b). (Stats. 1993, ch. 596, § 1, p. 3139.) An alternative bill making the statute gender neutral without modifying the wobbler classification of the offense failed to pass. (See Assem. Bill No. 415 (1993–1994 Reg. Sess.).) In 1995, in response to concerns about teen pregnancy, the Legislature considered a bill that would have amended section 261.5, subdivision (b) to classify unlawful sexual intercourse between an adult and a minor less than three years younger as a wobbler if the female became pregnant. (Assem. Bill No. 1490 (1993–1994 Reg. Sess.), as amended Apr. 6, 1995, §§ 1, 2, 3.) The Legislature in the end chose to address the problem by passing an amended version of the bill imposing substantial civil penalties for unlawful intercourse, without regard to pregnancy. (Stats. 1996, ch. 789, §§ 2, 3, pp. 4161–4162.)

"Normally, the widest discretion is allowed the legislative judgment in determining whether to attack some, rather than all, of the manifestations of the evil aimed at; and normally that judgment is given the benefit of every conceivable circumstance which might suffice to characterize the classification as reasonable rather than arbitrary and invidious." *(McLaughlin v. Florida* (1964) 379 U.S. 184, 191.) Here, the Legislature has devoted substantial attention to the punishments and penalties attaching to voluntary sexual conduct involving minors, and it is Griffin's burden to negate every circumstance that might have rationally supported its choices. For the reasons we have explained, *Hofsheier* and *Limon* addressed distinguishable issues and do not relieve Griffin from his burden in this case.

Further, we believe the Attorney General has proposed a rational basis for the distinction in penalty between section 288a, subdivision (b)(1) and section 261.5. As noted earlier, *Hofsheier* acknowledged there were media reports to the effect that oral copulation had become more prevalent among adolescents due to the risks of pregnancy and HIV transmission from engaging in sexual intercourse. (*Hofsheier*, *supra*, 37 Cal.4th

13

at p. 1203.)  Although there are academic survey studies substantiating these reports,[10] a rational basis supporting a legislative classification can be "any reasonably conceivable state of facts" that support the classification, even if based solely on "rational speculation unsupported by evidence or empirical data."  (*FCC v. Beach Communications, Inc.* (1993) 508 U.S. 307, 313, 315.)  It is "entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature."  (*Id.* at pp. 314–315.)

The Attorney General proposes that the Legislature might have rationally wanted to give judges discretion to impose felony punishment as a greater deterrent to oral copulation since the commission of that offense had become more common among teens due to the perceived lower risks, and minors were more likely to be persuaded to consent to it compared to sexual intercourse for the same reasons.  While *Hofsheier* found no logical or empirical linkage between the relative prevalence of oral copulation among teens and the imposition of mandatory sex offender registration on adults convicted of oral copulation with a minor, we find the data do have some logical relevance to the deterrent purposes served by criminal sentencing laws and classifications.

It is not irrational for the Legislature to want to deter offenses it perceives as more common, more difficult to detect, and more likely to be committed than similar offenses, by imposing more severe punishment for them, even if the less common offenses involve a greater risk of harm.  Thus, in *People v. Romo* (1975) 14 Cal.3d 189, the court found it was not an equal protection violation to allow a more severe sentence for assault with a deadly weapon (former section 245) than that permitted for the greater crime of assault with intent to commit murder (former section 217) on the grounds that the conduct

---

[10] See Halpern-Felsher et al., *Oral Versus Vaginal Sex Among Adolescents: Perceptions, Attitudes, and Behavior* (2005) 115 J. American Academy Pediatrics 4; Brady & Halpern-Felsher, *Adolescents' Reported Consequences of Having Oral Sex Versus Vaginal Sex* (2007) 119 J. American Academy Pediatrics 2.  A court "may consider arguments in support of finding a rational basis for the statute even if those arguments were not part of the original legislative discussion at the time of enactment." (*People v. Hollins* (Ill. 2012) 971 N.E.2d 504, 514–515.)

denounced by section 245 was more likely to occur than that denounced by section 217. (*Romo*, at pp. 196–197.) In *People v. Hernandez* (2005) 134 Cal.App.4th 474, the court upheld a statute imposing greater penalties on aiders and abettors of crimes committed for the benefit of street gangs than aiders and abettors of crimes committed for the benefit of equally or more dangers groups such as hate groups or terrorist organizations. (*Id*. at pp. 481–482.) The court cited statistics on the growing frequency of gang-related crimes and reasoned that the equal protection clause does not prohibit the Legislature from focusing its attention on the classes of cases where it deems the need to be greatest. (*Id*. at p. 482.)

Here, there is a " ' " 'reasonably conceivable state of facts' " ' "—data and media reports on the sexual behaviors and attitudes of teens— that " ' " 'could provide a rational basis' " ' " for the Legislature to classify oral copulation with a minor of age 16 or 17 as a wobbler while treating sexual intercourse with a minor of the same age as a misdemeanor. (*Hofsheier*, *supra*, 37 Cal.4th at p. 1201, italics omitted.) Whether that legislative distinction is wise or effective is not for this court to determine. Rational basis review is a " 'a paradigm of judicial restraint,' growing out of recognition that 'equal protection is not a license for courts to judge the wisdom, fairness or logic of legislative choices.' " (*Trihealth v. Board of Com'rs, Hamilton County, OH* (6th Cir. 2005) 430 F.3d 783, 791.)

For these reasons, Griffin's equal protection challenge to his sentence for count nine fails.

## B. *Propensity Instructions*

Griffin contends his rape conviction (count eight) must be reversed because (1) the jury was improperly instructed on the use of propensity evidence, and (2) the trial court failed to weigh the probative value of the propensity evidence against its prejudicial effect before giving the propensity instruction. Fields contends the propensity instruction given as to his sexual offenses improperly allowed the jury to find he was predisposed to commit all of the charged offenses, including two pimping counts.

15

## 1. *Griffin's Contentions*

If the defendant in a criminal action is accused of a sexual offense, evidence of the defendant's commission of another sexual offense can be admitted to show the defendant was disposed to commit such offenses. (Evid. Code, § 1108; *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159–1160 (*Villatoro*).) The other sexual offense can include an offense charged in the same action, or a separate uncharged sexual offense, as long as the jury finds the defendant had in fact committed the other offense. (*Villatoro,* at pp. 1160–1167.) To be considered as propensity evidence by the jury, uncharged sexual offenses need only be proved by a preponderance of the evidence. (*People v. Cottone* (2013) 57 Cal.4th 269, 287–288.) *Villatoro* held that in the case of charged offenses offered as propensity evidence the threshold standard of proof is the same as that required to prove the defendant guilty of the offense—proof beyond a reasonable doubt that he in fact committed the offense. (*Id.* at pp. 1167–1168.)

Here, the prosecution offered both charged and uncharged sexual offenses as propensity evidence relevant to proving count eight, forcible rape of Jane Doe 3. The jury was instructed in relevant part as follows using a modified version of CALCRIM No. 1191: "The People presented evidence that Defendant Griffin committed the crimes of lewd act upon child under age 14 as to Jane Doe 1; forcible rape as to Jane Doe 3; oral copulation of a minor under age 18, Jane Doe 3; and unlawful intercourse with a minor as to Jane Doe 2. These crimes are defined for you in these instructions. [¶] If you decide that the defendant committed a charged offense listed above or the uncharged offense as to Jane Doe 2, you may, but are not required to conclude from that evidence that the defendant was disposed or inclined to have the requisite intent for the crime[] charged in count[] . . . 8, . . . and based on that decision also conclude that the defendant was likely to and did have the requisite intent for [the] . . . offense[] alleged in count[] . . . 8 . . . . [¶] If you conclude that the defendant committed a charged offense or the uncharged offense as to Jane Doe 2 listed above, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of

16

[the] . . . offense[] as alleged in Count[] . . . 8 . . . . The People must still prove each element of every charge beyond a reasonable doubt."

Griffin points out the jury instruction in issue in *Villatoro* included the following language specifying the standard of proof the jury had to apply before it could consider one charged offense as evidence the defendant committed another charged offense: " 'The People must still prove each element of every charge beyond a reasonable doubt *and prove it beyond a reasonable doubt before you may consider one charge as proof of another charge.*' " (*Villatoro, supra*, 54 Cal.4th at p. 1167, italics added, fn. omitted.) The Supreme Court held this language "clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity," and thus "there was no risk the jury would apply an impermissibly low standard of proof." (*Id.* at p. 1168.) Griffin contends the instruction given in this case was not explicit enough about the standard of proof of charged offenses to eliminate the risk the jury would apply an impermissibly low standard of proof to decide whether to consider the specified charged offenses as evidence of his guilt for rape. He asserts that risk was compounded in this case because the jury (1) was instructed as to defendant Fields that it need only find by a preponderance of the evidence that he committed the uncharged offense of unlawful sexual intercourse with S.G. in order to consider it as propensity evidence, and (2) also instructed under CALCRIM No. 203 that "[u]nless I tell you otherwise, all instructions apply to each defendant."

"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from [one] particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538, overruled on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753.) In reviewing Griffin's claim, we look to the instructions as a whole to determine whether there is a reasonable likelihood the jury misunderstood the standard of proof it was to apply to the other charged offenses before it could consider them as evidence the defendant was guilty of rape. (*People v. Smithey* (1999) 20 Cal.4th 936, 963.) In doing so, we presume jurors are intelligent persons who are capable of understanding and correlating all of the jury instructions they are given.

17

(*People v. Guerra* (2006) 37 Cal.4th 1067, 1148, overruled on another point by *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

First, notwithstanding CALCRIM No. 203 we find no reasonable likelihood the jury believed it had to apply the same preponderance standard of proof to Griffin's charged offenses as it was instructed to apply to Fields's uncharged unlawful intercourse offense. The court gave separate and distinct instructions under CALCRIM No. 1191 for each defendant, mentioning them by name and delineating the specific offense or offenses to be considered by the jury as possible propensity evidence. This triggered the "unless I tell you otherwise" exception under CALCRIM No. 203, signaling to the jurors these instructions pertained *only* to the individual defendant named in them, not to both defendants. We must therefore presume the jury understood that the instruction on the use of propensity evidence it was told applied to Fields's uncharged offense did not also apply to Griffin.

We also do not find it reasonably likely the jury otherwise misunderstood the standard of proof to be applied under the modified CALCRIM No. 1191 instruction given as to Griffin. While *Villatoro* approved the instruction used in that case, it did not hold that particular wording was *mandatory* in all cases in which other charged sexual offenses are offered to prove a defendant's propensity or disposition to commit a specified sexual offense. The instruction given in this case made no reference to a more relaxed preponderance of the evidence standard of proof for any fact. To the contrary, the instruction told jurors, "The People must still prove each element of every charge beyond a reasonable doubt." The jury was also instructed with CALCRIM No. 220 that, "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." Because the instructions given here sufficiently emphasized the reasonable doubt standard applied to the determination of *all* charged offenses, there is no reasonable likelihood the jury applied a lesser standard in deciding whether Griffin committed one or more of the charged offenses specified in the propensity instruction.

We also reject Griffin's contention, based on the concurring and dissenting opinions in *Villatoro*, that the instruction sanctions a "bootstrapping" of verdicts, inviting

18

the jury if it found against defendant on one count to find against him on the other charges. As the majority concluded in *Villatoro*, allowing one charged sexual offense to be considered as potential evidence relevant to another charged sexual offense does not in fact permit the jury to convict the defendant of one count based simply on its guilty "verdict" on any other count. It requires the jury to make a *factual finding* that the defendant has committed a sex offense before it can draw an inference of disposition or propensity from such finding, and affirms that evidence the defendant committed a charged offense is only one factor to consider and may *not* be considered sufficient in itself to prove his guilt of another charged offense. (*Villatoro, supra*, 54 Cal.4th at p. 1165.) We are bound by the majority opinion in *Villatoro* on this point. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Griffin complains that before reading the modified CALCRIM No. 1191 to the jury the trial court undertook no analysis of the propensity evidence under Evidence Code section 352.[11] While recognizing that evidence of charged offenses may not be excludable under section 352, *Villatoro* held that some weighing of the evidence's probative value and possible prejudicial effect *as propensity evidence* is still appropriate. (*Villatoro, supra*, 54 Cal.4th at p. 1163.) If the sexual offenses are sufficiently dissimilar or so remote or unconnected to each other as to be inadmissible under a section 352 weighing test, it might not be proper for the jury to consider some of the charged offenses as evidence of a propensity to commit other charged offenses. (*Ibid.*) Here, there is no indication on the record the trial court conducted such an analysis. Griffin contends the charged oral copulation and lewd and lascivious conduct charges in this case were so

---

[11] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Evidence Code section 1108 provides in relevant part: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (*Id.,* subd. (a).)

dissimilar from the forcible rape charge it was improper to allow the jury to consider evidence of the former as evidence of his propensity to commit the latter.

We are not persuaded. Griffin maintains that evidence he engaged in unlawful sexual activities with a willing partner has no tendency to show he had a propensity for forcibly committing sexual acts over the protestations of an unwilling partner. This greatly overstates the differences between the rape charge against Griffin and his other sexual offenses. All of the victims of these offenses were highly vulnerable minors, runaways from a receiving home for foster children. All were sexually inexperienced. Jane Doe 1 was 13 years old. All were being manipulated by Griffin into prostituting themselves for his benefit. He had threatened them all with reprisals if they told about what was going on. It may be inferred Griffin felt he was in control of the minors and entitled to have sexual relations with them when he wanted to. In this context, the minors were not willing partners in any meaningful sense, and the dividing line was all but indiscernible between the rape conduct alleged against Griffin—proceeding to have intercourse with Jane Doe 3 despite her protestations and efforts to push him off—and the other sexual offenses charged against him. In the context of this case, the trial court's asserted failure to explicitly weigh the probative value of the latter offenses before giving the modified CALCRIM No. 1191 instruction was harmless.

We find no prejudicial error in connection with the propensity instruction given as to defendant Griffin.

## 2. *Fields's Contention*

There was evidence Fields engaged in unlawful sexual intercourse with 16-year-old S.G. in violation of section 261.5. Based on that evidence, the trial court instructed the jury with CALCRIM No. 1191. The instruction told the jury the prosecution had presented evidence "Defendant Fields committed the crime of unlawful intercourse with minor, [S.G.], from April 20th through April 28th, 2009 that was not charged in this case," and if the prosecution proved the uncharged offense by a preponderance of the evidence, the jury could, but was not required to, conclude from that evidence Fields "was disposed or inclined to commit sexual offenses," and based on that decision further

20

conclude he "was likely to commit and did commit unlawful sexual intercourse with a minor," as charged in count three. CALCRIM No. 1191 also cautioned the jury the uncharged offense evidence was "not sufficient by itself" to prove Fields "guilty of unlawful sexual intercourse with a minor," and the People still had to prove "the charge" beyond a reasonable doubt.

Fields contends the foregoing instruction is erroneous because it told the jury it could use the uncharged crime to conclude he was disposed or inclined to commit "sexual offenses" generally, which the jury "undoubtedly" interpreted to include the crime of pimping. According to Fields, pimping is commonly understood by nonlawyers to be a sexual offense. He maintains the jury might reasonably have interpreted the instruction "to mean that if it found, by only a preponderance of the evidence, that [Fields] had committed the uncharged crime, it could infer that he was disposed to commit the pimping charges." According to Fields, the instruction thereby violated his constitutional right to due process of law.

Preliminarily, we note the California Supreme Court found "no constitutional error" in the nearly identical predecessor instruction to CALCRIM No. 1191, CALJIC No. 2.50.01. (See *People v. Reliford* (2003) 29 Cal.4th 1007, 1012–1016.) There is no material difference between CALCRIM No. 1191 and the older CALJIC No. 2.50.01, and the analysis in *Reliford* applies with equal force to the CALCRIM instruction. (*People v. Cromp* (2007) 153 Cal.App.4th 476, 480.)

Further, we do not agree it was reasonably likely the jury misunderstood the instruction in the manner Fields proposes. First, it is pure supposition by Fields that pimping is "commonly understood" to be a sexual offense. By common understanding, a sexual offense would be one involving sexual activity or gratification by the offender. The elements of pimping were defined in the jury instructions, and included no such element. In any event, the instruction did not tell the jury it could use the uncharged crime to conclude Fields was disposed to commit sexual offenses *in general*. It told the jury that if it decided Fields committed the uncharged offense, it may, but was not required to, conclude defendant was disposed or inclined to commit sexual offenses, and

21

"based on that decision, also conclude that defendant was likely to commit and did commit *unlawful sexual intercourse with a minor, as charged here*." (Italics added.) The instruction thus specifically directed the jury's attention to the charged offense of unlawful sexual intercourse with a minor. It did not mention or direct the jury's attention to pimping, and it did not suggest the uncharged offense was relevant to any charged offense other than unlawful sexual intercourse with a minor. Assuming as we must that jurors are intelligent persons capable of understanding and following the jury instructions they are given, we find no reasonable likelihood the jury believed it could use evidence Fields had unlawful intercourse with S.G. to conclude he was guilty of pimping.

## C. *Failure to Instruct on Accomplice Testimony Principles*

Defendants join in the argument that their pimping and pandering convictions must be reversed because the trial court failed to instruct the jury sua sponte on the principles related to accomplice testimony. Defendants theorize Jane Doe 2 and Jane Doe 3 should have been considered as their accomplices in this case, and the jury should have been instructed on accomplice corroboration and the need to view accomplice testimony with caution.

Our Supreme Court held in *People v. Tobias* (2001) 25 Cal.4th 327 that when a child under 18 has a consensual sexual relationship with a parent she is still a victim and not a perpetrator of the incest. A child in this situation can never be an accomplice and accomplice instructions are not appropriate. (*Id*. at p. 329.) When an adult engages in sexual acts with a minor the law considers the minor to be the victim and places the burden on the adult to avoid the sexual relationship. (*Id*. at p. 337.) Even had they been adults, the minors in this case would not be treated as accomplices. In explaining why the Legislature affirmatively intended to punish prostitutes less severely than those arrested for pimping or pandering, the court in *People v. Pangelina* (1981) 117 Cal.App.3d 414 recognized "[i]t has been understood that, rather than being accomplices or coconspirators of those charged with felony pimping or pandering, prostitutes are criminally exploited by such persons." (*Id*. at p. 422.) "In a prosecution under section 266h . . . , the prostitute whose earnings are taken is not an accomplice

22

[citation]; and under section 266i . . ., the woman who is induced or procured to become an inmate of a house of ill-fame is not an accomplice." (*People v. Frey* (1964) 228 Cal.App.2d 33, 52; see also *People v. Berger* (1960) 185 Cal.App.2d 16, 19–20 ["it has been uniformly held in this state that the woman who is exploited by a male in violation of section 266h is not an accomplice of the man who exploits her"]; *People v. Grow* (1978) 84 Cal.App.3d 310, 313 [as a matter of law, adult "encounter parlor" employee was not an accomplice to pimping and pandering offenses charged].) Under California law, Jane Doe 2 and Jane Doe 3 were victims of defendants and not coconspirators or accomplices in their own abuse. No accomplice instruction was required.

## D. *Conspiracy Theory of Liability*

Defendants contend the trial court improperly instructed the jury they could be found guilty of pimping and pandering based on an uncharged conspiracy. In relevant part the jury was instructed as follows under CALCRIM No. 416: "The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy. [¶] To prove that a defendant was a member of a conspiracy in this case, the People must prove that: [¶] The defendant intended to agree and did agree with one or more of the other defendants and/or [S.G.], an uncharged co-participant, to commit pimping and/or pandering; [¶] At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit pimping and/or pandering; [¶] One of the defendants or [S.G.] or both or all of them committed at least one of the following overt acts to accomplish pimping and/or pandering in April of 2009: [¶] [listing overt acts]."

Defendants contend "conspiracy is not a valid theory of criminal liability" in California and "[t]he myriad cases that hold otherwise without critical examination of section 31, the controlling statute, are not viable." Section 31 provides in relevant part that "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being

23

present, have advised and encouraged its commission, . . . are principals in any crime so committed." According to defendants, a conspiracy theory of liability is inconsistent with section 31 because the statute does not state that people who conspire to commit a crime—unless they also engage in conduct amounting to aiding and abetting—are principals in the commission of the crime. Cases recognizing conspiracy liability are "divorced from and in conflict with the plain language of section 31," according to defendants.

Defendants' contention was directly refuted in *People v. Mohamed* (2011) 201 Cal.App.4th 515, review denied February 29, 2012: "The 'all-persons concerned' language in section 31 indicates the Legislature intended the definition of principal to apply broadly. [Citation.] A broad application of the language would necessarily include conspirators. As one appellate court explained, ' "All persons concerned in the commission of a crime . . . are principals" and, when two or more are "concerned," they are bound by the acts and declarations of each other, when such acts and declarations are part of the "transaction" in which they are engaged, because they are "principals" and not because they are conspirators. . . . [C]onspiracy comprehends nothing that is not included in the definition of "who are principals." Liability attaches to anyone "concerned," however slight such concern may be, for the law establishes no degree of the concern required to fix liability as a principal.' " (*Id.* at p. 524.)

In any event, the California Supreme Court has consistently held conspirators are liable as principals for substantive crimes committed by another conspirator. (*People v. Belmontes* (1988) 45 Cal.3d 744, 788, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Kauffman* (1907) 152 Cal. 331; *People v. Creeks* (1915) 170 Cal. 368, 374–375; *People v. Harper* (1945) 25 Cal.2d 862, 871–873; *People v. Weiss* (1958) 50 Cal.2d 535, 563.) Under *Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at page 455, we are bound by these decisions to reject defendants' claim that the use of CALCRIM No. 414 constituted prejudicial error.

**E.** *Pimping Instruction*

Fields contends a modified version of CALCRIM No. 1150 given as to counts one and two (for pimping minors Jane Doe 2 and Jane Doe 3, respectively) improperly lightened the prosecution's burden of proving the crime of pimping beyond a reasonable doubt.

The jury was instructed as follows as to the elements of pimping: "Defendant Fields is charged in Count . . . with pimping in violation of Penal Code section 266h. [¶] To prove that the defendant is guilty of pimping, the People must prove that: [¶] The defendant knew that Jane Doe . . . was a prostitute; and [¶] The money and/or proceeds that Jane Doe . . . earned as a prostitute supported the defendant, in whole or in part; or [¶] The defendant received payment for soliciting prostitution customers for Jane Doe . . . ; and [¶] Jane Doe . . . was a minor over the age of 16 years when she engaged in the prostitution." In addition, a further instruction on pimping requested by the prosecutor and given by the trial court over Fields's objection stated: "A conviction for deriving support from a prostitute's earnings does not require evidence that the defendant received money directly from the prostitute, *or that the money received paid his own living expenses.*" (Italics added.) According to Fields, the italicized language directly contradicted the CALCRIM pattern instruction which requires the money earned from prostitution by the minor "supported the defendant, in whole or in part."

An appellate court will examine the jury instructions as a whole, along with the attorneys' closing arguments to the jury, to determine if the instructions sufficiently conveyed the correct legal principles. (See, e.g., *People v. Moore* (1988) 47 Cal.3d 63, 87–89 [closing arguments can be considered in determining adequacy of accomplice instruction].) The record shows the portion challenged by Fields was intended to clarify for the jury that Fields's "support" was broader than just his living expenses. After reading the challenged portion of the instruction to the jury in closing argument, the prosecutor explained it, without objection, as follows: "So it can be a third party intermediary. You don't have to use it specifically for your rent, specifically for your utilities. There's no specific thing you need to do with the money. If you're using it, if

25

you're putting it in savings, if you're putting gas in your car, if you're feeding yourself or others, that is sufficient under the law." For his part, Fields's attorney argued to the jury there was no evidence Fields received or used any of the money derived from Jane Doe 2's and Jane Doe 3's acts of prostitution.

The arguments of counsel correctly framed the issues for the jury. To support a pimping conviction, it is not necessary to prove the money defendant received went *solely* to pay for *his own* expenses (*People v. Navarro* (1922) 60 Cal.App. 180, 182), or to prove exactly how the defendant spent the money he received (*People v. Giambone* (1953) 119 Cal.App.2d 338, 340, disapproved on another ground in *People v. Smith* (1955) 44 Cal.2d 77, 80–81). It is immaterial the defendant has ample legitimate income from other sources to fully support him. (*People v. Coronado* (1949) 90 Cal.App.2d 762, 766–767; see also *People v. Kennedy* (1962) 200 Cal.App.2d 814, 817 [not a defense to pimping that the accused had a sufficient income from other sources].) The cases thus establish, "The scope of proof does not necessitate a showing that the money earned from prostitution was actually spent to provide support and maintenance if it may reasonably be inferred that the accused has spent the money or applied it to his benefit." (*People v. Ganatta* (Colo. 1981) 638 P.2d 268, 271–272 [construing California cases].) In *People v. Jackson* (1980) 114 Cal.App.3d 207, the Court of Appeal upheld a conviction for pimping based solely on evidence the defendant picked up $33 from a motel room bed derived from a single act of prostitution. (See also *Kennedy*, at p. 817 [no showing is required that money defendant received from person he knew to be a prostitute was used for his support and maintenance].)

We do not think it was reasonably likely the jury would have understood the challenged portion of the pimping instruction as eliminating or diluting the requirement that the prosecution prove beyond a reasonable doubt defendant received, and derived benefit from, the money Jane Doe 2 and Jane Doe 3 earned from prostitution, as the case law requires. Certainly there was ample evidence from which the jury could have concluded this element was satisfied. Jane Doe 3 testified she gave the money she earned from prostitution to Fields, and got none back. She testified she saw him put the money

26

in his pocket. Jane Doe 2 testified S.G. told her the money from her and Jane Doe 3's acts of prostitution went to both S.G. and Fields. Jane Doe 2 testified she received no money from them for what she had to do. She further testified she handed the considerable money she and Jane Doe 3 collected from having sex with several men in a hotel room to Fields and S.G. S.G.'s sister, D.G., testified S.G. would give money to Fields and she saw Fields with "racks" of money. During the time the minors were staying at the San Ramon house, D.G. saw S.G. give cash to Fields after she returned from dates that he would count and put in his pocket. D.G. heard S.G. and Fields talking about how Fields would put the money in a bank account and spend it on clothes and buying a new car. In April 2009, she saw Fields come into the San Ramon residence with groceries and bags of new clothes he and S.G. had bought. She saw Fields filling his car with gas. D.G. testified Fields had a lot of jewelry and clothes, liked to go shopping, and owned three or four cars.

In view of the case law, the evidence, and the arguments of counsel we find no error in the modified CALCRIM No. 1150 instruction given, nor any reasonable likelihood the jury misunderstood the instruction to mean the prosecution did not have to prove beyond a reasonable doubt that the minors' prostitution earnings supported Fields, in whole or in part.

## F. *Restitution Issues*

The trial court ordered Fields and Griffin, jointly and severally, to pay restitution to Jane Doe 1 and her guardian/parent in the amount of $3,000, under section 1202.4, subdivision (f). Fields contends the award was improper as to him because he was not charged with or convicted of any criminal acts against Jane Doe 1. Griffin for his part maintains he was deprived of his right to unconflicted counsel at the restitution hearing because Fields's trial counsel, Christopher Feasel, specially appeared to represent both defendants at the hearing.

Fields's contention has merit, as the Attorney General properly concedes. "Courts have interpreted section 1202.4 as limiting restitution awards to those losses arising out of the criminal activity that formed the basis of the conviction." (*People v. Woods* (2008)

161 Cal.App.4th 1045, 1049.)  In *Woods*, this court held that a defendant convicted of being an accessory after the fact to a murder could not be ordered to pay restitution to the murder victim's family under section 1202.4 because his conduct did not cause the loss for which compensation was sought.  (*Woods*, at p. 1051.)  We rejected the argument that a conviction of being an accessory after the fact had sufficient nexus to the victim's economic loss to render that loss a "result" of the defendant's conduct for purposes of section 1202.4, subdivision (f).[12]  (*Woods,* at p. 1052.)  We believe the trial court erred in this case in imposing a restitution obligation on Fields because he was "essentially the kingpin of the operation," who was "responsible for whatever happens under his tutelage," including the crimes committed by Griffin.  That result was improper under *Woods*.  We will therefore reverse the restitution order as to Fields.

Even assuming for the sake of analysis Griffin has shown Feasel represented conflicting interests at the restitution hearing, he has failed to show prejudice—a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different.  The record shows Jane Doe 1's expenses were incurred as the result of Griffin's unlawful sexual conduct with her.  Under these circumstances, there is no possibility the trial court would have placed *less* responsibility for restitution on Griffin just because Fields was, he asserts, the kingpin of the criminal enterprise, and the older of the two.  We find no basis for reversing the restitution award as to Griffin.[13]

## III.  DISPOSITION

The order for restitution as to defendant Fields is reversed.  In all other respects we affirm the judgments.

---

[12] With exceptions not relevant here, section 1202.4, subdivision (f) provides, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court."

[13] In his opening brief, Griffin states he "joins in and incorporates all of the arguments and contentions made by codefendant Fields that may inure to his benefit." We have found no instance in which our resolution of Fields's claims benefits Griffin.

_____
Margulies, Acting P. J.

We concur:


_____
Dondero, J.


_____
Banke, J.

Trial Court:   Contra Costa County Superior Court

Trial Judge:   Hon. Theresa J. Canepa

Counsel:

William J. Capriola, under appointment by the Court of Appeal, for Defendant and
Appellant Duwan D. Fields.

Mark Shenfield, under appointment by the Court of Appeal, for Defendant and Appellant
Claudiens Santrail Griffin.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Assistant
Attorneys General, René A. Chacón and Nanette Winaker, Deputy Attorneys General for
Plaintiff and Respondent.